# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | JAMES B. ZAGEL | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5203 | **DATE** | AUG 2 9 2002 |
| **CASE TITLE** | | Nash v. Clark | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [58-1] is granted. The clerk is directed enter judgment in favor of defendants Dwayne Clark, Jerome Springborn, V.C. Russell, Roberta Fews, Christopher Hughes, and Jerry Jones and against plaintiff Levi Nash pursuant to Fed. R. Civ. P. 56. This action is dismissed with prejudice in its entirety. Plaintiff's motion for summary judgment [60-1] is denied.

(11) ■ [For further detail see attached Memorandum Opinion and Order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 3 0 2002 | |
| X | Docketing to mail notices. | | date docketed | 71 |
| X | Mail AO 450 form. | | CDY | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| CLH | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LEVI NASH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 99 C 5203 |
| | ) | |
| DWAYNE A. CLARK, et al., | ) | HONORABLE JAMES B. ZAGEL |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Levi Nash, an inmate incarcerated at Stateville Correctional Center, brought this *pro se*

civil rights action pursuant to 42 U.S.C. § 1983 on August 9, 1999, alleging that Stateville

defendants violated his Eighth Amendment rights. Specifically, Nash alleged in his complaint

that he is a non-smoker and that the defendants have placed him in cells with smokers, thereby

exposing him involuntarily to Environmental Tobacco Smoke ("ETS").

The defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, and on April 18, 2000, this court granted the motions to dismiss in part and

denied them in part, dismissing several of the defendants from this action. Following the

rationale of the Seventh Circuit in *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999), this

court dismissed Nash's present injury claims because he failed to allege a sufficiently serious

injury or medical need. At the same time, however, the court stated that it could not determine at

that stage in the proceedings whether Nash could prove, to a reasonable degree of certainty, an

increased risk of *future harm* attributable to his ETS exposure. The court cited the *Henderson*

ruling, noting that it left the door open to a plaintiff who could make such a showing of future harm.

In the April 2000 ruling, this court stated that there were "many variables to consider in determining whether a person exposed to ETS will develop a smoking-related disease," citing *Henderson*, 196 F.3d at 852. The court added that a "list of factors to evaluate in Nash's case may include but would not be limited to: (1) Nash's hypertension; (2) [defendants'] knowledge of the inadequate ventilation in cells contributing to the problem of ETS; (3) the existence of any non-smoking policy and defendants' willingness to enforce it; (4) the broken window in Nash's cell preventing the circulation of ETS [outside] Nash's cell; and (5) the duration Nash is confined in a smoky cell."

The remaining defendants have now filed a motion for summary judgment, basing that motion to a large extent on their contention that Nash "is not at significant risk of developing a smoking-related illness, and it cannot be proven to a reasonable degree of medical certainty that any illness he currently suffers from is significantly affected by ETS."

### Standard of Review on a Motion for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In short, summary judgment is appropriate when there is no genuine issue of material fact, and the

moving party is entitled to summary judgment as a matter of law. *See O'Connor v. DePaul University*, 123 F.3d 665, 669 (7th Cir. 1997), citing *Celotex* at 322. In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir. 1986). When the district court is presented with a motion for summary judgment, it is not the district court's role to sift through the evidence and decide whom to believe. The court will, however, enter summary judgment against a party who does not come forward with evidence that would reasonably permit a finder of fact to find in his or her favor on a material question. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, to defeat a motion for summary judgment, the nonmoving party must come forward with appropriate evidence demonstrating that there is a pending dispute of material fact. *Id.* at 921. He or she must set forth specific facts showing that there is a genuine issue for trial, i.e., that there is sufficient evidence allowing a jury to return a verdict in favor of the nonmoving party. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994).

### Facts

The defendants have attached a number of affidavits and other exhibits to their motion for summary judgment. In support of their contention that Nash "is not at significant risk of developing a smoking-related illness, and it cannot be proven to a reasonable degree of medical certainty that any illness he currently suffers from is significantly affected by ETS," they have attached the affidavit of Willard Elyea, formerly the Stateville medical director, currently the medical director of the Illinois Department of Corrections (IDOC) (Defendants' Exhibit 9).

3

Elyea states that he reviewed Nash's medical chart and did not note any condition that "has medically required Nash to have a non-smoking cell assignment or non-smoking cell-mate." The affidavit adds that although "those who are diagnosed with hypertension are advised not be smokers themselves, there is no significant medical evidence that exposure to second-hand smoke by Nash aggravates his condition [hypertension] or predisposes him to suffer a significantly increased risk of other medical conditions."

The defendants also claim that Nash's housing placements have been "based on safety and security concerns of the institution," making it sometimes impossible to accommodate non-smoking requests. In support of that claim, they have attached the affidavit of defendant Vernette Covin-Russell, the Training Coordinator at Stateville, formerly Unit Manager of Stateville's H-House Protective Custody Unit, where Nash was housed (Defendants' Exhibit 8). Relevant statements in her affidavit include the claim that the ventilation system in the unit was regularly repaired by the maintenance staff. She also claims that "every effort was made to provide non-smoking inmates with non-smoking housing assignments, wherever possible," but that security and safety factors were also considered when assignments were made. Covin-Russell states that she was familiar with Nash, was aware that he requested non-smoking housing assignments, and "expended every effort, consistent with...safety and security concerns..., to house [him] according to his request." According to Covin-Russell, Nash was in 16 different cells in H-House between November 1998 and April 2002, and many of his moves were "made to accommodate his request. However, when security required, other concerns...were addressed over Nash's non-smoking request." The affidavit adds that Nash was "never housed with a smoker as an intentional action to harass, harm or punish him," and that Covin-Russell was "not aware of any

4

health or medical condition of Nash that required him to be housed in a non-smoking [cell]."

The defendants have also attached the affidavit of Defendant Jerry Jones, assignment placement officer at Stateville, in which Jones denies that he has had any responsibility for Nash's cell placements (Defendants' Exhibit 6).

In addition, the defendants argue (1) that they "did not have the sufficiently culpable mental state to exhibit deliberate indifference to a serious need," (2) that they are entitled to qualified immunity, and (3) that Nash's action is "moot as to future damages, due to the fact that as of September 14, 2001, [Nash] was housed in a non-smoking unit and will not be going back to Unit H [the unit in which he was housed at the time he filed his complaint]."

Nash has responded by filing a document in opposition to the defendants' motion for summary judgment, along with his own motion for summary judgment in his favor. The claims made by Nash in these documents include the following:

1. His housing placements have not been based on safety and security concerns of the institution; the defendants' claims that they have been based on those concerns are allegations made to justify the defendants' acts of retaliation against Nash for filing lawsuits.

2. The defendants not only have the required mental state to exhibit deliberate indifference to a serious medical need, but they "regularly brag about [their] actions against plaintiff...."

3. He is at significant risk of developing a smoking-related illness and has been for the last four years and "can and will prove...to a reasonable degree of medical certainty that his hypertension is a result of the effects of ETS."

4. Routine maintenance is not performed on the ventilation system or windows; in fact,

5

these are broken "years at a time before fixed," and most of the time "never get fixed."

    5. The action is not moot because of his placement in a new housing unit, which is purported to be a non-smoking unit, because "staff and inmates alike smoke regularly all day every day without anyone [intervening or stopping] them."

    In support of these claims, Nash disputes a number of facts stated by the defendants, several of which this court has previously deemed significant in the determination of future injury. For example, he states that the written non-smoking policy is violated by the defendants themselves and is not enforced anywhere in Stateville. He states that he has submitted a number of grievances at Stateville making these claims, and he has attached four of these grievances: (1) grievance dated May 24, 2000, which focused on health problems related to ETS and was denied because he was moved to a non-smoking cell; (2) grievance dated August 30, 2001, which was denied without detailed explanation; (3) grievance dated January 7, 2001; and (4) grievance dated March 31, 2001, which focused on his religious diet program and his claim that smoking in the dining room prevented him from observing his diet at every meal. No resolution of (3) or (4) is included. (Plaintiff's Exhibits 2-4.)

    Nash also states that regardless of the defendants' claims regarding housing assignments, defendant Jerry Jones, who is designated as the assignment placement officer, has the power and authority to place inmates wherever he chooses. Nash adds that he spoke with Jones on several occasions about his cell placement and also wrote numerous letters to Jones, which he has attached to his complaint.

    In addition, Nash claims that he has been housed with heavy smokers for a period of years, despite his requests to be in a non-smoking area, and even now, although he is in an area

6

designated as non-smoking, the policy is not enforced. He claims that 70 to 80 percent of the Stateville staff smoke, and that these employees often ask inmates for cigarettes or confiscate inmates' smoking materials and pocket them for their own personal use. He disputes that defendant Covin-Russell expended every effort to house him in a non-smoking area. He claims that defendant Christopher Hughes threatened to kill Nash for filing grievances and lawsuits, and Nash has attached affidavits by fellow inmates who state that they heard Hughes make these threats.

According to Nash, because of his complaints, the defendants "deliberately placed one smoker after another" in his cell and left him in cells with broken ventilation systems and broken windows. He alleges that they "placed so many smokers in [his cells that he] declared a hunger strike" and was taken to disciplinary segregation for two and a half weeks before he was taken to the hospital for not eating. He claims that this event caused him to suffer kidney failure and almost cost him his life. An affidavit by Joseph Kerry Smith, M.D., medical director at Stateville at the time of the hunger strike, supports the claim that the refusal to eat essential nutrients threatened Nash's kidney function and could have ultimately threatened his life.

Regarding the defendants' statement that the Stateville medical director (now medical director of IDOC), Willard Elyea, reviewed Nash's medical chart and did not note any condition that "has medically required Nash to have a non-smoking cell assignment or non-smoking cell-mate," Nash maintains that he has never been examined by Elyea or otherwise evaluated for harm from ETS. He further alleges that he is on medication for hypertension, but each time he is forced to share his cell with smokers, his blood pressure "shoots up."

In addition, Nash states that there is "medical proof" that his hypertension "was caused

7

and affected by exposure to ETS." In support of this claim, he has attached as an exhibit a collection of published presentations by scholars who appeared at a symposium on ETS. Nash has also attached numerous affidavits by his fellow inmates in support of his contention that the "no smoking" policy at Stateville is not followed by those operating the prison, and that these inmates have also suffered from exposure to ETS. Further, he claims that his medication has been changed four to five times because of his exposure to ETS.

## Analysis

The question this court must decide is whether Nash, who suffers from hypertension, for which he takes medication, has stated an Eighth Amendment claim of future injury to his health resulting from exposure to ETS, which he claims has been continuous over a period of years and is continuing, and which he also claims is deliberate on the part of the defendants. In order to state an Eighth Amendment claim, a prisoner must allege that an official was deliberately indifferent to a known risk of serious harm to the inmate. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The question of inmate exposure to ETS has been the focus of litigation that has reached both the United States Supreme Court and the Seventh Circuit Court of Appeals. In *Helling v. McKinney*, 509 U.S. 25 (1993), the Supreme Court had "to decide whether the health risk posed by involuntary exposure of a prison inmate to [ETS] can form the basis of a claim for relief under the Eighth Amendment." *Id.* at 25. The inmate, McKinney, alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes a day, and he complained of health problems allegedly caused by ETS. The Court upheld the ruling of the Ninth Circuit Court of

Appeals that McKinney stated a cause of action under the Eighth Amendment by alleging that prison officials had, with deliberate indifference, exposed him to levels of ETS that posed an unreasonable risk of serious damage to his future health. *Id.* at 35. At the same time, the Court made clear that, on remand to the District Court, McKinney would have to prove both the subjective and the objective elements necessary to prove an Eighth Amendment violation. To satisfy the objective factor, the inmate had to show that he himself was being exposed to unreasonably high levels of ETS, and the court had to conclude that the risk he faced was "not one that today's society chooses to tolerate." *Id.* at 35-36. To satisfy the subjective factor, the court on remand would have to determine whether prison officials' "current attitudes and conduct" showed deliberate indifference. The Court viewed adoption and enforcement of a formal smoking policy as highly relevant to this inquiry. *Id.* at 36.

In this court's ruling of April 18, 2000, *Nash v. Clark*, No. 99 C 5203, it noted both *Helling* and the more recent decision of the Seventh Circuit in *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999). In *Henderson*, the Seventh Circuit affirmed the District Court's conclusion that the *present* injuries alleged by the inmate, Ellis Henderson, were relatively minor. *Id.* at 845. When it considered Henderson's *future* injury claims, it also upheld the District Court's conclusion that there was no genuine issue of material fact regarding whether Henderson could prove that he had suffered an increased risk of developing future serious health problems as a result of the prison officials' actions. The Seventh Circuit noted that Henderson's own medical expert could not testify to a reasonable degree of certainty that Henderson himself faced a 20 percent increased risk of disease as a result of his exposure to ETS. *Id.* at 847-50.

In this court's April 18, 2000, opinion, the court noted five factors to consider in

determining whether Nash could prove to a reasonable degree of certainty an increased risk of future harm attributable to his ETS exposure. The court will now consider those five factors in light of the evidence attached to the parties' motions for summary judgment.

1. Nash's hypertension

Hypertension, or high blood pressure, is a common ailment in the United States. It is estimated that 50 to 70 million Americans have hypertension. *Steadman's Medical Dictionary* 855 (27th ed. 2000). About one-third of this number are receiving appropriate treatment, which includes the use of a broad range of drugs. *Id.* The goal of treatment in most cases is to control hypertension, resulting in the decrease of blood pressure to normal levels. Drug treatment is given where warranted; other therapies include weight reduction and cessation of heavy alcohol consumption. *Attorneys' Textbook of Medicine* ¶¶31.50-52 ( Roscoe N. Gray, M.D., & Louis J. Gordy, M.D., LL.B., eds., 3d ed. 2002). Nash is therefore within a large group of Americans who have hypertension, and he is receiving appropriate treatment through drug therapy.

Although the defendants claim that there is no medical proof to a reasonable degree of certainty that Nash's hypertension was caused or affected by exposure to ETS (see ¶9 of the Elyea affidavit), and Nash claims that his hypertension worsens each time he is exposed to ETS, neither side has presented compelling evidence on this issue. The defendants have attached to their motion for summary judgment numerous pages of photocopied medical notes, most of which are illegible and from which it is impossible for the court to draw any conclusions.

According to the affidavit of Dr. Elyea (who undoubtedly has more legible copies of these notes), however, the medical record reveals that Nash's lungs were examined at least seven

times, and each time they were reported as being "clear." Elyea affidavit at ¶12. In this affidavit, Elyea also states that he did not note any condition on Nash's medical chart that "has medically required Nash to have a non-smoking cell assignment or non-smoking cell-mate."

On the other hand, Nash himself has been unable to present any medical evidence other than his own statements that his hypertension worsens when he is exposed to ETS and that his medication has as a result been adjusted whenever necessary. As the court noted above, he has also attached to his motion, as an exhibit, a collection of published presentations by scholars who appeared at a symposium on ETS. Several of these touch on the subject of medical consequences of exposure to ETS, including "Environmental Tobacco Smoke and Cardiovascular Disease: A Critique of the Epidemiological Literature and Recommendations for Future Research" by Lawrence M. Wexler, Ph.D.; "Effects of ETS Exposure on Pulmonary Function and Respiratory Health in Adults" by Philip Witorsch, M.D.; and "Risk Assessments Relating to Environmental Tobacco Smoke" by Alan J. Gross, Ph.D.

A cursory review of these articles, however, reveals that they do not provide strong support for Nash's claims. For example, in the first paragraph of the Wexler article, the author states his opinion that currently available evidence does not demonstrate "that exposure to ETS increases the risk of cardiovascular disease." Wexler recommends further study to determine whether such causality can be demonstrated. Similarly, the Witorsch article states that although some studies have shown a relationship between ETS exposure and a decline in pulmonary function, other studies have not. Witorsch also recommends further examination of the problem. Finally, the Gross article notes that the validity of risk-assessments in this area has been called into question and states that "[m]uch more scientific work is still necessary before one could

11

conclude with any confidence that exposure to ETS involves a quantifiable risk of any particular health hazard."

This court has addressed the question of ETS exposure in another recent case, *Holman v. Gillen*, 2002 WL 276147, No. 00 C 833 (N.D. Ill. Feb. 27, 2002). The inmate, Holman, complained that there were no designated non-smoking cells in the Protective Custody Unit, where he was housed, and he had been required to share his cell with a smoker even though he had asthma and hypertension, conditions that could be aggravated by exposure to smoke. This court concluded that Holman had not established that "the basic standards of human decency that constitute the lower limit of constitutional treatment of prisoners mandate a smoke-free environment for those who want it." *Id.* at *3, citing *Carroll v. DeTella*, 255 F.3d at 472-73 (7th Cir. 2001).

The record in *Holman* indicated, however, that Holman had been treated for smoke-aggravated asthma. Further, while Holman did not present any professional testimony supporting his claim that he needed to be placed with a non-smoker, there was also no professional testimony supporting the conclusion that he did *not* need to be placed with a non-smoker. This court noted that "in deciding a motion for summary judgment I may not draw an inference *against* Holman, the non-moving party, in the absence of evidence that should have been readily available to defendants." *Id.* at *4. This court therefore distinguished the facts in *Holman* from those in two earlier cases that held against the plaintiffs, *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999) (where the plaintiff did not allege that a physician had diagnosed him as having a medical condition that necessitated a smoke-free environment or treated him for any condition caused by his exposure to ETS), and *Oliver v. Deen*, 77 F.3d 156 (1996) (where the defendants

12

had submitted a treating physician's affidavit stating that the plaintiff's asthma was mild and did not require his housing with a non-smoker).

The facts here are somewhat different from those in *Holman*. Here, Nash has been seen by Stateville medical staff and has been treated and is being treated for hypertension with medication the staff has prescribed. Although we have no affidavit from a treating physician, we do have an affidavit from the medical director of IDOC, who has reviewed Nash's medical records and states that these records do not reveal any condition that "has medically required Nash to have a non-smoking cell assignment or non-smoking cell-mate." The affidavit adds that although "those who are diagnosed with hypertension are advised not be smokers themselves, there is no significant medical evidence that exposure to second-hand smoke by Nash aggravates his condition [hypertension] or predisposes him to suffer a significantly increased risk of other medical conditions." Most significantly, Nash's lungs have been examined seven times and found to be "clear." This situation thus more closely resembles that in *Oliver* than that in *Holman*.

The ruling in *Henderson v. Sheahan* also weighs in favor of the defendants. Although, unlike Henderson, Nash has alleged that he is being treated for a condition, hypertension, caused by ETS exposure, Nash has, like Henderson, failed to present any professional testimony establishing that he has an increased risk of developing future serious health problems as a result of the defendants' actions. On the contrary, the evidence he has presented–the symposium articles–undermine his position because they state that a connection between ETS and the increased risk of serious health problems has not yet been demonstrated.

Thus, even though the level of ETS in Nash's cell may on occasion be high, he has failed

13

to submit evidence that this level is likely to cause him serious injury in the future. Although he suffers from hypertension, he has offered no evidence, other than his own beliefs, that this condition will be worsened by his exposure to ETS.

This court therefore concludes that there is insufficient evidence to support Nash's claim that he "can and will prove...to a reasonable degree of medical certainty that his hypertension is a result of the effects of ETS." Accordingly, he has not demonstrated the existence of a genuine issue of material fact on this issue.

## 2. Defendants' knowledge of inadequate ventilation in cells

Nash has claimed that the defendants left him in cells with broken ventilation systems and broken windows and that his health suffered as a result. The defendants responded that they are not responsible for problems with ventilation in the cells or broken windows. They state that their only responsibility is to notify the maintenance staff of inmate complaints about the facilities, and it is the maintenance staff's duty to repair facilities like the ventilation system. *See* Affidavit of Vernette Covin-Russell. Covin-Russell claims that inmates themselves damaged the ventilation system by stuffing paper into the vents and that she "observed staff take these items out of the vents." In addition, she "would routinely follow-up on any claim of a broken window." *Id.* at ¶¶ 3-4.

Nash's claims suggest that the defendants may have shirked their supervisory responsibilities. If the maintenance staff fails to keep the ventilation system in proper order, the defendants bear some responsibility for that failure. This problem does not, however, rise to the level of a constitutional violation.

14

Conditions such as poor ventilation do not fall below "the minimal civilized measure of life's necessities," absent medical or scientific proof that such conditions exposed the prisoner to diseases or respiratory problems which he would not otherwise have suffered. Thus, when an inmate makes nothing more than "conclusory allegations, without backing from medical or scientific sources, that [unventilated] air exposed him to diseases...," such evidence is insufficient to defeat a properly supported summary judgment motion. *Dixon v. Godinez,* 114 F.3d 640, 645 (7th Cir. 1997 ). Nash has merely claimed that his health suffered; he has not identified any disease or respiratory problem that he suffered because of inadequate ventilation.

3. The existence of any non-smoking policy and defendants' willingness to enforce it

The defendants have attached to their motion for summary judgment copies of two relevant policies at Stateville: (1) the Smoking Policy that became effective on July 10, 2000 (Defendants' Exhibit 4), and (2) the Non-Smoking Cell Assignments directive that became effective on September 9, 1998 (Defendants' Exhibit 5).

The smoking policy states that smoking is permitted in certain areas of Stateville, including all inmate cells in general population and protective custody units unless specifically designated as non-smoking, but that inmates in segregation units shall adhere to a tobacco-free policy. Inmates and staff who fail to comply with the policy are subject to discipline. The cell-assignment directive states the general policy that "Every effort shall be made to provide non-smoking inmates with non-smoking housing assignments wherever possible." In addition, it states the following specific rules:

•   Inmates may request non-smoking cells

15

- The assignment/placement officer shall review requests and recommend assigning an inmate to a non-smoking cell, as available

- Unit managers shall house non-smoking inmates together, wherever possible

- Inmates shall not be permitted to make or possess smoking materials in non-smoking cells, and any such materials shall be confiscated and disposed of as contraband

- If a staff person observes an inmate smoking in a non-smoking cell, the inmate shall be removed from the non-smoking housing

- Inmates who have requested designation as non-smokers may not purchase smoking materials from the commissary

Thus, it appears that Stateville has issued reasonable policies intended to accommodate inmates who are non-smokers as well as those who are smokers. The problem raised by this case is, however, Nash's allegation that the policies are not enforced. He states that the non-smoking rules are ignored by both inmates and staff, and indeed that staff members frequently ask inmates for their smoking materials and even confiscate inmates' smoking materials for their own use. Nash's claims on this subject are supported by a large number of affidavits submitted by his fellow inmates.

This factor appears to weigh in Nash's favor. A written policy is not worth much if it is not enforced, and the inmate affidavits, along with Nash's statements, suggest that the policies are not enforced at Stateville. This court noted a similar complaint in *Holman*, where the court stated that the defendants' "reliance on an official policy of accommodating non-smokers to the extent practicable cannot justify summary judgment in the face of Holman's assertions in his

16

deposition that the policy was not followed." 2002 WL 276147 at *5. Similarly, in this case, the defendants cannot simply rely on their official policies when inmates assert that the policies are not enforced.

On the other hand, the existence of these policies, even when they are imperfectly enforced, defeats the mental-state component of an Eighth Amendment claim. It is difficult to conclude that the prison authorities intend to harm inmates when they have been attempting, within the limits of security and safety concerns, to separate smokers from non-smokers. The Eighth Amendment prohibits "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97 (1976). Here, the adoption by the defendants of a restrictive smoking policy undermines Nash's allegation that the defendants have ignored the health risks associated with ETS.

4. The broken window in Nash's cell, preventing the circulation of ETS

This factor relates to the failure of the defendants to properly supervise the maintenance of prison facilities, discussed under point 2 above.

5. The duration Nash is confined in a smoky cell

According to the defendants, Nash has been assigned since September 14, 2001, to a non-smoking unit. If the non-smoking policies are enforced at Stateville, Nash would not appear to have a valid complaint on this issue. If the non-smoking policies are not enforced, however, as Nash and many of his fellow inmates have alleged, then his assignment to non-smoking housing does not currently, and will not in the future, prevent his continued exposure to ETS. Therefore,

17

his exposure to ETS appears to be of an indefinite duration.

Nash's situation resembles, however, the situation involving a plaintiff named Robert Henderson. In *Henderson v. Fews*, No. 01 C 4897, 2001 WL 873016 (N.D.Ill. Aug. 2, 2001), Judge Holderman concluded that the inmate, Robert Henderson, had not alleged an Eighth Amendment claim. Henderson was a non-smoker assigned to a cell in a non-smoking area of Sheridan Correctional Center. He stated that he had high blood pressure and complained that smoking was permitted in the dayroom and that smoking materials were sold to his fellow inmates. He alleged that ETS increased the health risks of inmates with serious health problems, such as high blood pressure, and wanted the prison to either provide a non-smoking recreational area or stop the sale of smoking materials to inmates.

Noting the rulings in *Helling v. McKinney* and *Henderson v. Sheahan*, Judge Holderman stated that exposure to ETS could constitute a sufficiently serious risk to an inmate's health to implicate the Eighth Amendment, but that exposure to ETS is not an objectively serious injury per se. *Id.* at *2. Henderson had failed to state a claim based on the possibility of future injury because he had alleged no symptoms that one could infer resulted from smoke exposure. *Id.* at *3. And while claims of *continuous* exposure to excessive levels of secondhand smoke might support an inference that damage was being inflicted on a plaintiff's body over time, the court wrote, Robert Henderson spent a limited amount of time exposed to ETS.

Judge Holderman concluded that absent "extreme individual sensitivity, ...requiring a prisoner to breathe smoke-polluted air *occasionally* does not rise to the level of cruel and unusual punishment." *Id.* (emphasis added). The court added, "Limited exposure to second-hand smoke is a risk our society chooses to tolerate," *id.,* and the Eighth Amendment "does not require

prisons to provide prisoners with more salubrious air...than [is] enjoyed by substantial numbers of free Americans." *Id.* at 4, quoting *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001).

Like Robert Henderson, Nash has been assigned to a non-smoking unit and, even though he has alleged that the non-smoking policy is not uniformly enforced, the environment in that unit undoubtedly limits exposure to ETS to some degree. This precedent therefore provides additional support for the conclusion that there is no violation of the Eighth Amendment in this case.

### 6. Defendants' conduct toward Nash, including alleged retaliation

A sixth factor, not identified in this court's April 18, 2000, ruling, appears to be relevant at this point. This factor is the defendants' conduct toward Nash. Nash has alleged that the defendants have a "policy and practice" to harm his future health and that of all other non-smokers, and that he "is still being injured by these conditions." He added that his housing placements have not been based on safety and security concerns but are "deliberate acts of retaliation against [Nash] for filing lawsuits." Specifically, he stated that the defendants have deliberately placed him in cells with heavy smokers in retaliation for his filing grievances and this lawsuit.

The court notes, however, that the defendants placed Nash in a non-smoking unit in September 2001. Although the smoking policy and cell-assignment policy have not been enforced to Nash's complete satisfaction, it appears that the defendants have made some effort to remove Nash from his previous environment and place him in a unit where he is less likely to be exposed to ETS. Any alleged retaliation that may have occurred in the past is no longer an issue,

19

and any alleged retaliation that may be occurring at the present time must be stated in more specific terms than Nash has employed.

To sum up the competing claims of Nash and the defendants, the court concludes that, on balance, summary judgment should be granted to the defendants. Although Nash has alleged a lack of enforcement of the non-smoking policies, the defendants have countered that they enforce them whenever possible, and Nash appears to be exposed to ETS far less regularly than he was in the past. He does not appear to suffer from a serious health condition that is clearly aggravated by ETS, such as chronic severe asthma, and the defendants' conduct toward him does not appear to be deliberately indifferent.

Although conditions at Stateville do not appear to be ideal for non-smokers, the Eighth Amendment "does not require prisons to provide prisoners with more salubrious air...than [is] enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Summary judgment is therefore granted in favor of the defendants.

In light of this ruling, the court need not reach any other issues raised by either side.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted on the ground that Nash has failed to demonstrate that the conditions of his confinement rose to the level of a constitutional violation. The Clerk is directed to enter judgment in favor of defendants Dwayne Clark, Jerome Springborn, V.C. Russell, Roberta Fews, Christopher Hughes, and Jerry Jones and against plaintiff Levi Nash pursuant to Fed. R. Civ. P. 56. This action is dismissed with prejudice in its entirety.

If Nash wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed.R.App.P. 4(a)(4). If he does so, he will be liable for the $105 appellate filing fee. Unless he is granted leave to proceed *in forma pauperis*, he will have to pay the fee immediately. If he cannot do so, the appeal will be dismissed, but he will remain liable for the fee and it will be deducted from his inmate trust fund account in installments. *Newlin v. Helman*, 123 F.3d 429, 434 (7th Cir. 1997). If this court finds that appeal is not taken in good faith, and the Court of Appeals agrees, he will not be permitted to proceed *in forma pauperis* and pay the fee in installments, but will have to pay the fee immediately or the appeal will be dismissed. 28 U.S.C. § 1915(a)(3); *Newlin*, 123 F.3d at 433-34. To avoid a finding that the appeal is not taken in good faith, a motion to proceed *in forma pauperis* on appeal should explain the grounds for the appeal. *See Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999); *Newlin*, 123 F.3d at 433; Fed. R. App. P. 24(a)(1)(C).

Enter:

James B. Zagel
United States District Judge

Date: 29 August 2002